# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No. CR 07-1014  JB

ALEJANDRO GUTIERREZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress and Memorandum in Support, filed July 12, 2007 (Doc. 34).  The Court held an evidentiary hearing on the motion on September 14, 2007.  The primary issues are: (i) whether the interaction between Defendant Alejandro Gutierrez and Drug Enforcement Administration ("DEA") Task Force Officer Justin Dunlap  was a consensual encounter; (ii) whether the officers had reasonable suspicion to subject Gutierrez to an investigatory detention; (iii) whether there was probable cause to arrest Gutierrez; and (iv) whether the warrantless search of Gutierrez' cellular telephone was authorized. The Court finds that the initial encounter between Gutierrez and the DEA officers was a consensual encounter, but that the consensual encounter ripened into an investigative detention.  The Court finds that reasonable suspicion supported the officers' investigative detention of Gutierrez.  The Court also finds that Dunlap had probable cause to arrest Gutierrez. Accordingly, the Court will deny Gutierrez' motion to suppress.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      On April 25, 2007, Dunlap visited the Americanos and Greyhound Bus Stations.  See Transcript of Hearing (taken Sept. 14, 2007)("Tr.") at 3:14-15 (Ramirez), id. at 8:11-13 (Ramirez & Dunlap).[1]

2.      Officers Jeremy Bassett and Officer Will Dorian accompanied Dunlap.  See Tr. at 10:10-12 (Ramirez & Dunlap).

3.      Dunlap was dressed in plain clothes, and his weapon and badge were not readily visible.  See Tr. at 8:21-25 (Ramirez & Dunlap).

4.      The Bernalillo County Sheriff's Department employs Dunlap and assigns him to the DEA as a task force officer.  See Tr. at 4:19-20

5.      Dunlap has undergone a 126-week academy, drug interdiction, and consensual encounter training.  See Tr. at 5:14-18 (Dunlap & Ramirez).

6.      Dunlap described the pattern of narcotics smuggling in shoes as follows: "Usually

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

the person who is wearing the shoes arrives and is picked up by someone else.  Usually they're transported somewhere else for a short period of time where they get a new pair of shoes or the illegal substance is taken out of their shoes.  Then generally they return to wherever they came from originally within a short period of time."  Tr. at 7:9-14 (Dunlap).

7.      Dunlap testified that he was familiar with DEA seizures of narcotics smuggled in persons' footwear in the eighteen months before April 25, 2007.  See Tr. at 6:18-21 (Ramirez & Dunlap).

8.      Dunlap clarified, however, that in the past eighteen months not very many people had been arrested for smuggling narcotics in footwear.  See Tr. at 6:22-25 (Ramirez & Dunlap).

9.      Dunlap testified that the El Paso/Juarez area is known to him as a source city for illegal narcotics.  See Tr. at 6:4-7 (Ramirez & Dunlap).

10.     The Albuquerque Police Department employs Bassett as a narcotics detective and assigns him to the DEA interdiction unit.  See Tr. at 79:11-13 (Bassett).

11.     Bassett was dressed in plain clothes on April 25, 2007.  See Tr. at 80:11-12 (Ramirez & Bassett).

12.     Bassett's gun and badge were not visible to the public, although he had them on his person.  See Tr. at 80:13-16 (Ramirez & Bassett).

13.     The New Mexico State Police employs Dorian and it assigns him to the DEA interdiction unit.  See Tr. at 95:13-17 (Ramirez & Dorian).

14.     Dorian has taken multiple classes in advanced interdiction, a "jet way school," which Dorian did not explain in his testimony, and several classes on consensual encounters.  See Tr. at 95:25-96:3 (Dorian).

15.     Dorian testified he was aware of seizures of narcotics secreted in footwear.  See Tr.

-3-

at 96:7-10 (Ramirez & Dorian).

16.     Dorian also testified that the El Paso/Juarez area is known to him as a source city for illegal narcotics.  See Tr. at 97:5-7 (Ramirez & Dorian).

17.     Bassett saw approximately fifteen to twenty persons in the general bus station area when he arrived on April 25, 2007.  See Tr. at 81:22-23 (Bassett).

18.     Dunlap approached a male, later identified as co-Defendant Juan Vega, as Vega was sitting outside in the center courtyard of the Americanos bus station by the flag pole close to the street.  See Tr. at 1-3 (Ramirez & Dunlap), id. at 10:16-17 (Dunlap).

19.     Dunlap removed his badge of office from his left rear pocket, displayed his badge to Vega, identified himself as a police officer, and asked permission to speak with him.  See Tr. at 10:19-20 (Dunlap).

20.     Dunlap attempted to speak with Vega; however it "became evident" to Dunlap that Vega does not speak English.  Tr. at 10:21-23 (Dunlap); id. at 31:25-1 (Chavez & Dunlap).

21.     Dunlap understands "bits and pieces of Spanish," but does not speak fluent Spanish. Tr. at 31:22-23 (Dunlap).

22.     Dunlap knew one of the security guards working at the bus station spoke Spanish. See Tr. at 10:25-11:1 (Dunlap).

23.     Dunlap contacted that security guard, and asked the guard if he would be willing to interpret questions that Dunlap would ask in English and interpret them to Vega in Spanish.  See Tr. at 11:1-4 (Dunlap).

24.     The security guard, Reynaldo Raya, agreed to translate for Dunlap.  See Tr. at 11:6 (Dunlap), id. at 67:7-8 (Raya), id. at 67:23-24 (Ramirez & Raya).

25.     Dunlap had no way to verify for himself whether Raya's translations into Spanish

were accurate or not.  See Tr. at 34:21-35:2 (Chavez & Dunlap).

26.     Raya is a fluent speaker in Spanish and English.  See Tr. at 68:12-13 (Ramirez &
Raya); id. at 68:17-18 (Ramirez & Raya).

27.     Raya is still learning English and admits that it is not perfect.  See Tr. at 76:17-18
(Raya).

28.     Dunlap then reapproached Vega, displayed his badge of office, identified himself as
a police officer, and asked for permission to speak with him.  See Tr. at 12:16-19 (Dunlap).

29.     Dunlap asked the questions in English, and Raya translated the questions into Spanish
for Vega.  See Tr. at 12:20-21 (Dunlap).

30.     Vega told Raya it was "fine" for Raya to translate Dunlap's English into Spanish for
him.  Tr. at 70:15-16 (Ramirez & Raya).

31.     Dunlap asked for and received permission to speak to Vega.  See Tr. at 12:20-21
(Dunlap).

32.     Dunlap asked Vega about his travel and asked him from where he was coming.  See
Tr. at 12:22-24 (Dunlap).

33.     Vega answered that he was coming from the El Paso area.  See Tr. at 12:24-25
(Dunlap).

34.     Dunlap then asked Vega where he was going. See Tr. at 12:25 (Dunlap).

35.     Vega told Dunlap that he was in Albuquerque to visit a friend for several days.  See
Tr. at 14:1-2 (Dunlap).

36.     The only luggage that Vega carried was a small, black, soft-sided cooler.  See Tr. at
14:4-5 (Dunlap).

37.     Vega gave Dunlap permission to search the cooler.  See Tr. at 15:5-6 (Dunlap).

38.     When Dunlap opened it, he discovered a black jacket, a small amount of an unknown medication, and a burrito.  <u>See</u> Tr. at 15:5-8 (Dunlap).

39.     Dunlap then secured consent to pat-down Vega and did a pat-down on Vega.  <u>See</u> Tr. at 15:21-22 (Dunlap).

40.     Dunlap did not feel anything abnormal.  <u>See</u> Tr. at 15:22-23 (Dunlap).

41.     Dunlap said he noticed that Vega's shoes "did not appear to look what I would call normal on his feet."  Tr. at 15:24-25 (Dunlap).

42.     To Dunlap, it appeared that Vega's foot was sitting higher up in the shoe than it normally would, and that the part where the laces comes together was spread out really, really far, like Vega's foot was bulging out of his shoe.  <u>See</u> Tr. at 16:1-4 (Dunlap).

43.     Dunlap then asked for and received consent to search Vega's shoes.  <u>See</u> Tr. at 16:11-12 (Dunlap).

44.     Vega's left shoe appeared extremely heavy.  <u>See</u> Tr. at 16:13 (Dunlap).

45.     When Vega handed Dunlap his left shoe, Dunlap pulled back the inner liner and could see what appeared to be something wrapped in a brown plastic material and glued onto the bottom of Vega's shoe.  <u>See</u> Tr. at 16:13-17 (Dunlap).

46.     Dunlap believed, consistent with his training and experience, that the packaging was heroin.  <u>See</u> Tr. at 61:18-20 (Ramirez & Dunlap).

47.     Dunlap handcuffed Vega and placed him under arrest.  <u>See</u> Tr. at 16:22-23 (Dunlap).

48.     Vega was placed in the front of Bassett's vehicle while Dunlap was obtaining information from Raya.  <u>See</u> Tr. at 18:4-5 (Dunlap).

49.     As Dunlap was speaking with Raya and getting information for his report, Bassett advised Dunlap that Vega was trying to tell him something in Spanish, but that Bassett did not

understand what Vega was saying.  See Tr. at 18:9-13 (Dunlap).

50.     Bassett does not speak Spanish.  See Tr. at 84:11-12 (Bassett).

51.     Bassett can understand very limited words in Spanish.  See Tr. at 84:11 (Bassett).

52.     Bassett saw Vega using his head to motion that something was in a plastic bag where Bassett had placed Vega's property.  See Tr. at 90:19-22 (Bassett).

53.     Bassett inferred from Vega's expression that "it was something important, a concern that he had."  Tr. at 84:15-16 (Bassett).

54.     Dunlap brought Raya back to the vehicle with him, and asked Raya to ask Vega what he was trying to say to them.  See Tr. at 18:14-15 (Dunlap).

55.     Raya told Dunlap what Vega was saying.  See Tr. at 18:18-19 (Dunlap).

56.     Vega said he was there to drop off the shoes.  See Tr. at 18:18-19 (Dunlap).

57.     Vega also said that he made a telephone call when he arrived at the bus station and was told by the person he called to wait in front of the bus station.  See Tr. at 18:19-22 (Dunlap).

58.     Vega said he did not know exactly what the person looked like because he had never met him before.  See Tr. at 18:23-24 (Dunlap).

59.     The only thing that Vega knew was that the person's name was "Pelon."  Tr. at 18:24-25 (Dunlap).

60.     Vega never gave Dunlap a physical description of "Pelon."  Tr. at 35:25-36:2 (Chavez & Dunlap).

61.     Dunlap believes that "Pelon" means bald or balding in Spanish.  Tr. at 36:4-6 (Dunlap).

62.     Bassett observed a red Jetta pull up and stop.  See Tr. at 85:18-20 (Bassett).

63.     He observed a man inside the car looking towards the  courtyard area for somebody.

-7-

See Tr. at 85:24-25 (Bassett).

64.     It caught his interest because most people do not stop in that area to pick anyone up. See Tr. at 86:1-4 (Bassett).

65.     They usually drive into the courtyard to pick people up, or will park and walk into the Greyhound station.   See Tr. at 86:1-4 (Bassett).

66.     Bassett then observed the car turn around several times  and park.  See Tr. at 86:16-18 (Bassett).

67.     It appeared to Bassett that the driver was looking for someone in the courtyard area. See Tr. at 86:11-13 (Bassett).

68.     He could see the individual, later identified as Gutierrez, in the car.  See Tr. at 86:14-15 (Bassett).

69.     Bassett saw Gutierrez get out of the car and start walking towards the courtyard.  See Tr. at 86:18-20 (Bassett).

70.     Bassett again observed Gutierrez looking for somebody.   See Tr. at 86:21-22 (Bassett).

71.     At the time that Gutierrez arrived, Bassett did not recall anyone else waiting out front. See Tr. at 89:1-4 (Ramirez & Bassett).

72.     Bassett then drove his vehicle southbound, and parked it so that he could observe Dunlap and Dorian in case they needed his assistance. See Tr. at 89:21-24 (Bassett).

73.     When Dunlap saw the red Jetta, it was already stopped.  See Tr. at 19:24-20:1 (Ramirez & Dunlap).

74.     Dunlap remembers Bassett telling him that he witnessed a small, red Volkswagen Jetta go through the area several times and then park across the street from where they had originally

found Vega.  <u>See</u>  Tr. at 19:8-12 (Dunlap).

75.     Bassett told Dunlap that he saw a person driving back and forth out front who was bald, and told Dunlap it could be the person coming to pick up Vega. <u>See</u> Tr. at 88:18-22 (Bassett).

76.     Dunlap observed Gutierrez, who appeared to be walking from the vehicle.  <u>See</u> Tr. at 20:3-4 (Dunlap).

77.     Gutierrez was bald.  <u>See</u> Tr. at 20:4 (Dunlap).

78.     Dunlap did not remember seeing very many people in the general vicinity of the bus stop at the time that Gutierrez exited the vehicle.  <u>See</u> Tr. at 20:5-9 (Dunlap).

79.     Dunlap stopped Gutierrez because Gutierrez was bald.  <u>See</u> Tr. at 39:22-24 (Chavez & Dunlap).

80.     Dunlap displayed his badge of office, identified himself as a police officer, and asked permission to speak with Gutierrez.  <u>See</u> Tr. at 20:10-18 (Ramirez & Dunlap), <u>id.</u> at 20:24-21 (Dunlap).

81.     Dunlap spoke English with Gutierrez throughout the entire conversation.  <u>See</u> Tr. at 21:7-8 (Ramirez & Dunlap).

82.     Gutierrez responded to Dunlap in English.  <u>See</u> Tr. at 21:9-10 (Ramirez & Dunlap).

83.     Dunlap asked Gutierrez why he was at the bus station.  <u>See</u> Tr. at 21:13 (Dunlap).

84.     Gutierrez told Dunlap that he was there to pick up his wife, who had come in on the bus from El Paso.  <u>See</u> Tr. at 21:14-15 (Dunlap).

85.     Dunlap then asked Gutierrez , if his wife had arrived on the bus, where his wife was. <u>See</u> Tr. at 21:15-16 (Dunlap).

86.     Gutierrez told Dunlap he did not know.  <u>See</u> Tr. at 21:18 (Dunlap).

87.     Dunlap acknowledged that, when he talked to Gutierrez, Gutierrez had not yet gone

inside the bus depot.  See Tr. at 45:24-46:4 (Dunlap & Chavez).

88.     Dunlap acknowledged that it is not unusual for people to go to bus depots looking for someone.  See Tr. at 46:13-15 (Dunlap & Chavez).

89.     Dunlap testified he did not see Gutierrez' wife in the terminal on that day.  See Tr. at 60:10-17 (Ramirez & Dunlap).

90.     Gutierrez appeared extremely nervous to Dunlap.  See Tr. at 21:19 (Dunlap).

91.     Dunlap saw Gutierrez' hands visibly shaking.  See Tr. at 21:20 (Dunlap).

92.     Dunlap then asked Gutierrez if he had any identification with him.  See Tr. at 21:20-21 (Dunlap).

93.     Gutierrez then gave Dunlap a New Mexico driver's license.  See Tr. at 21:21-22 (Dunlap).

94.     While Gutierrez was speaking with Dunlap, Dunlap noticed that Gutierrez had a cellular telephone in his hand.  See Tr. at 23:14-16 (Ramirez & Dunlap).

95.     At the time Dunlap was speaking with Gutierrez, Dorian was speaking with the passenger of the red Volkswagen Jetta -- later identified as Francisco Fuentes-Ontiveros.  See Tr. at 23:11-13 (Dunlap); id. at 100:15-17 (Ramirez & Dorian).

96.     When Dorian began speaking with Ontiveros, Dorian realized Fuentes-Ontiveros was not an English speaker.  See Tr. at 100:18-21 (Ramirez & Dorian).

97.     Dorian then asked Raya to interpret for him to Fuentes-Ontiveros.  See Tr. at 100:22-24 (Ramirez & Dorian).

98.     Fuentes-Ontiveros did not know exactly who he and Gutierrez were picking up from the bus station.  See Tr. at 101:10-11 (Dorian).

99.     Fuentes-Ontiveros said they were there to pick an unknown male subject.  See Tr.

at 101:8-9 (Dorian).

100.    Fuentes-Ontiveros said he was not in the country legally, and Dorian observed a license from the Republic of Mexico which Fuentes-Ontiveros had in his possession.  See Tr. at 101:16-19 (Dorian).

101.    Dorian then relayed all of the information from Fuentes-Ontiveros to Dunlap.  See Tr. at 101:20-24 (Ramirez & Dorian).

102.    Dorian then told Dunlap that, while he was speaking with Fuentes-Ontiveros, Fuentes-Ontiveros told him that he and Gutierrez work together.  See Tr. at 24:1-4 (Ramirez & Dunlap).

103.    Dorian also told Dunlap that Fuentes-Ontiveros said Gutierrez had picked him up from work and asked him if he wanted to go on an errand with him to the bus station, to which Ontiveros said "Yes."  Tr. at 24:4-6 (Dunlap).

104.    Dunlap, Dorian, and Bassett decided to detain Gutierrez, Fuentes-Ontiveros, and Vega, and to transport them back to the DEA office.  See Tr. at 24:11-14 (Dunlap).

105.    Dorian reports that they decided to detain Gutierrez, Fuentes-Ontiveros, and Vega, based upon their conflicting stories.  See Tr. at 102:11-17 (Ramirez & Dorian).

106.    Dunlap reports that he arrested Gutierrez based upon his conversation with him, upon Gutierrez' baldness, and Gutierrez' nervousness.  See Tr. at 47:4-7 (Dunlap).

107.    Dunlap placed Gutierrez in handcuffs.  See Tr. at 63:14-17 (Ramirez & Dunlap).

108.    Dorian did a pat-down search of Fuentes-Ontiveros.  See Tr. at 102:18-19 (Ramirez & Dorian).

109.    Dorian discovered that Fuentes-Ontiveros had a large bundle of U.S. currency in one of his pockets that was folded in half.  See Tr. at 102:21-24 (Ramirez & Dorian).

110.    Dorian had previously seen money carried in that fashion in narcotics' investigations. See Tr. at 102:25-103:5 (Ramirez & Dorian).

111.    Dunlap had seen currency folded in the same manner as the bills in Fuentes-Ontiveros' pocket in other narcotics trafficking situations.  See Tr. at 24:18-24 (Ramirez & Dunlap).

112.    Dorian discovered approximately $1,600.00 in large bills in Fuentes-Ontiveros' pocket.  See Tr. at 24:15-17 (Ramirez & Dunlap).

113.    Vega told Dunlap that he had the telephone number of the person named "Pelon" in a small address book in his wallet. Tr. at 25:2-9 (Ramirez & Dunlap).

114.    Once they returned to the DEA office, they located that address book and located the number written below the name "Pelon" in it.  Tr. at 25:11-12 (Dunlap).

115.    Dunlap acknowledged that Gutierrez was in handcuffs at the DEA office at the time he retrieved the phone number for "Pelon."  Tr. at 92:14-17 (Chavez & Dunlap).

116.    Bassett reports that, when they returned to the DEA office, Dunlap called the phone number for "Pelon" on his government cell telephone.  Tr. at 91:15-18 (Dunlap).

117.    The telephone in Gutierrez' pocket began ringing.  See Tr. at 25:12-14 (Dunlap); id. at 91:19-25 (Ramirez & Bassett).

118.    Once Gutierrez' telephone began ringing, Dunlap checked the telephone and verified that it was ringing from the same number they were calling.  See Tr. at 27:11-13 (Dunlap).

119.    Once they returned to the DEA office, Dunlap advised Gutierrez of his constitutional rights.  See Tr. at 27:16-20 (Ramirez & Dunlap).

120.    Dunlap advised Gutierrez of his rights in English.  See Tr. at 27:21-22 (Ramirez & Dunlap).

121.    Dunlap asked Gutierrez, after advising him of "each part of his rights," if he

understood before he moved to the next part.  Tr. at 27:25-28:1 (Dunlap).

122.   Dorian observed Dunlap read Gutierrez his <u>Miranda</u> rights, and after each line Gutierrez told Dunlap he understood.  <u>See</u> Tr. at 103:25-104:18 (Ramirez & Dorian).

123.   Dunlap did not have Gutierrez sign an acknowledgment of his <u>Miranda</u> rights.  <u>See</u> Tr. at 58:9-11 (Chavez & Dunlap).

124.   Dunlap obtained consent to search the vehicle.  <u>See</u> Tr. at 28:4-6 (Ramirez & Dunlap).

125.   Dorian observed Gutierrez give consent to search his vehicle.  <u>See</u> Tr. at 105:3-13 (Ramirez & Dorian).

126.   When Dunlap obtained Gutierrez' consent to search his vehicle, he did not appear to be under the influence of anything, and was not forced or coerced in any way.  <u>See</u> Tr. at 29:3-10 (Ramirez & Dunlap); <u>id.</u> at 105:14-24 (Ramirez & Dorian).

127.   Gutierrez did not attempt to stop the interview or terminate his consent to search. <u>See</u> Tr. at 29:11-14 (Ramirez & Dunlap).

128.   The only thing found in Gutierrez' vehicle was the charger for the two cellular telephones that he had with him.  <u>See</u> Tr. at 57:12-15 (Chavez & Dunlap).

129.   Gutierrez did not have any box with shoes in his vehicle.  <u>See</u> Tr. at 57:16-17 (Chavez & Dunlap).

## PROCEDURAL BACKGROUND

Gutierrez moves the Court, pursuant to the Fourth Amendment to the United States Constitution, to suppress evidence seized as a result of his detention and subsequent arrest by Dunlap, for an order suppressing all evidence seized from him and from the vehicle that he was driving on April 25, 2007, and any statements obtained thereafter, including, but not limited, to the

following:  (i) any and all objects or items discovered on his person or in his vehicle on April 25,

2007; and (ii) any and all statements that he made to law enforcement officers on April 25, 2007.

See Motion to Suppress and Memorandum in Support, at 1, filed July 12, 2007 (Doc. 34) ("Motion

to Suppress and Memorandum in Support").  As grounds and justification for his suppression

motion, Gutierrez states that: (i) he was subjected to an investigatory detention without reasonable

suspicion that he had committed, or was about to commit, a crime; and (ii) he was arrested without

probable cause.  See Motion to Suppress and Memorandum in Support at 1.  Gutierrez contends that

the officers had no reasonable suspicion for their investigatory detention of him, because, "[i]f a

person can not be detained solely on the basis of Mexican ancestry, then it would logically follow

that a person can not [sic] be detained on the basis of being bald."  Motion to Suppress and

Memorandum in Support at 5.  Gutierrez contends that the officers' "investigative detention [of him]

ripened into an arrest."  Motion to Suppress and Memorandum in Support at 6.  Gutierrez contends

"[t]his is true because [he] was handcuffed and transported to a detention facility." Id.  Gutierrez

argues that the officers lacked probable cause to arrest him, because:

> The only facts the government can point to are that they arrested another individual
> with a quantity of drugs at a bus depot.  This individual claimed he was to be picked
> up by a bald individual.  [Gutierrez] was seen walking towards the bus depot; was
> bald and was extremely nervous when speaking with police.  Their [sic] was a
> discrepancy as to whether he was supposed to pick up his wife, or a male individual
> as believed by his passenger.  Moreover, [Gutierrez] suggests that even if the officers
> had known at the time of the arrest, with absolute certainty, that [Gutierrez] was at
> the bus depot to pick up the individual found with the narcotics, the arrest would
> have still been illegal since there was no evidence to suggest that [Gutierrez] knew
> anything about the illegal narcotics.

Motion to Suppress and Memorandum in Support at 7.  Gutierrez contends that the evidence and

statements taken from him after his investigatory detention were fruits of an illegal search and

seizure, and therefore should be suppressed under Mapp v. Ohio, 367 U.S. 643, 654 (1961).

-14-

In its Response, the United States contends that the encounter between Dunlap and Gutierrez was consensual.  See United States' Response to Defendant's Motion to Suppress and Memorandum in Support ("Response"), filed Aug. 8, 2007 (Doc. 37).  The United States contends that Dunlap needed no reasonable suspicion to encounter Gutierrez, because Dunlap's brief questions of Gutierrez would not have conveyed to a reasonable person that he or she was required to comply. See Response at 7.  The United States contends that at no time did Dunlap display his weapon, that Dunlap was dressed in plain clothes, that Dunlap was the only officer to approach Gutierrez, and that Dunlap did not touch Gutierrez until Gutierrez consented to a pat-down search.  See Response at 8. The United States contends that Dunlap's questioning was not intimidating nor coercive, and that Gutierrez "consented" to speak with Dunlap; "[t]herefore, consent to the encounter should be deemed voluntary."  Response, at 8.

The United States argues that the officers had sufficient collective knowledge to justify reasonable suspicion and to subject Gutierrez to an investigative detention.  See Response at 9.  The United States summarizes the collective knowledge it contends the officers shared when Dunlap contacted Gutierrez:

> At the time Defendant Gutierrez was contacted, TFO Dunlap was aware that Mexican couriers traveled from El Paso, Texas, on northbound bus lines, smuggling heroin inside the soles of shoes.  TFO Dunlap was also aware that in circumstances where a courier was traveling with narcotics secreted in shoes, the courier traveled with no luggage.  The courier is often picked up at the bus station, and is driven to a local department store so that new shoes can be purchased for the courier to return home in.  TFO Dunlap had just placed Vega-Ferias under arrest for the transportation of an unknown quantity of illegal narcotics.  Vegas-Ferias had been provided a telephone number to call when he reached Albuquerque, and the name, "Pelon."  Although Vega-Ferias stated he could not describe the person, Vega-Ferias indicated he had already placed a call for someone to pick him up from the station.  Vega-Ferias was instructed to wait in front of the station.  Defendant Vega-Ferias was traveling with no luggage.  TFO Dunlap knew that following the purchase and exchange of shoes, these couriers would eventually be transported to the bus station in Albuquerque, for their return trip to El Paso, Texas.

Response at 10-11. The United States also contends that Bassett relayed information to Dunlap about his observations of two men in a red Jetta, appearing to be looking for someone.  The United States concedes that no contraband was found on Gutierrez, but argues that the cellular telephone found in Gutierrez' possession was suspicious because, "[b]ased on his[ ] training, and experience, [Dunlap] was aware that cellular telephones are often used to facilitate communication among drug traffickers, and are considered tools of the trade."  Response at 12 (citing United States v. Slater, 971 F.2d 626, 637 (10th Cir. 1992)(stating that a cellular telephone is a "recognized tool of the trade in drug dealing.").

The United States further contends that the officers had probable cause to arrest Gutierrez. The United States concedes that "[b]oth Gutierrez and Fuentes-Ontiveros were advised they were not free to leave, and were detained by law enforcement."  Response at 12.  The United States contends that Gutierrez, Vega, and Fuentes-Ontiveros were not placed under arrest until after Dunlap called the phone number for "Pelon" from Vega's address book, after Gutierrez' cellular telephone began ringing, and after Dunlap confirmed the caller identification on Gutierrez' cellular telephone of the telephone from which Dunlap was calling.  Response at 12-13.  "Based on his training, experience and the collective knowledge of the agents at the station, the actions of [Gutierrez] and his incoherent story about why he was at the bus station, TFO Dunlap had probable cause to believe the sealed bundles secreted in the soles of the shoes contained heroin or some other controlled substance and that . . . Gutierrez was the person to whom those shoes were to be delivered to, and that the $1,600 was payment for the deliver [sic]."  Response at 13.  Lastly, the United States contends that the result of Gutierrez' fingerprints and his true identity as Jorge Gonzalez-Contreras are admissible. See Response at 13.  The United States implicitly conceded that Dunlap arrested Gutierrez at the bus station.  See Tr. at 124:12-15 (Ramirez)("All of those factors combined were

-16-

the factors that led [T]ask [F]orce [O]fficer Dunlap to believe that there was sufficient probable cause to detain this individual."); id. at 124:15-20 ("[Gutierrez] was placed into cuffs and low and behold, one final piece of information came to light, and that is the passenger of the vehicle had $1600 neatly wrapped as it had been on numerous occasions where both [T]ask [F]orce [O]fficer Dunlap and Task Force Officer Dorian indicated had to do with narcotics seizures.").

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment guarantees that people will be secure against unreasonable search and seizures. Accordingly, the Fourth Amendment protects against unreasonable seizures. See U.S. Const. amend. IV. "The touchstone of an analysis of a seizure under the Fourth Amendment is reasonableness." United States v. Baity, No. CR 05-186 JB, 2006 WL 1305036, at *4 (D.N.M. Jan. 25, 2006)(Browning, J.)(citing Pennsylvania v. Mimms, 434 U.S. 106, 108-109 (1977)).

"Evidence seized pursuant to a warrantless search, once questioned,  must be suppressed unless the search and seizure come within an exception to the Fourth Amendment requirement of a warrant. The burden is on those seeking the exemption to show the need for it." United States v. Baity, 2006 WL 1305036, at *4 (internal quotations omitted).

"In analyzing Fourth Amendment search and seizure issues, the United States Court of Appeals for the Tenth Circuit has separated police and citizen interactions into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests." United States v. Grant, No. CR 05-2511, 2006 WL 1305037, at * 5 (D.N.M. Apr. 10, 2006)(Browning, J.)(citing Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

> In determining whether a seizure comports with the Fourth Amendment, courts have identified three categories of police encounters: "[i] consensual encounters which do not implicate the Fourth Amendment . . . [ii] investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and [iii] arrests, the most intrusive of

Fourth Amendment seizures and reasonable only if supported by probable cause.

United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)(quoting United States v. Davis, 94

F.3d 1465, 1467-68 (10th Cir. 1996)).  Further,

> [t]hese categories are not static.  A consensual encounter may escalate into an
> investigative detention.  An investigative detention may escalate into a full-blown
> arrest or it may de-escalate into a consensual encounter.  A reviewing court must
> analyze each stage of the encounter, ensuring that the requisite level of suspicion or
> cause is present at each stage.

United States v. Shareef, 100 F.3d at 1500.  "Much as a bright line rule would be desirable, in

evaluating whether an investigative detention is unreasonable, common sense and ordinary human

experience must govern over rigid criteria." United States v. Espinosa, 782 F.2d 888, 891 (10th Cir.

1986)(internal quotations omitted).

### A.    CONSENSUAL ENCOUNTERS.

Officers seized a person when they detained him "for the purpose of requiring him to identify

himself." Brown v. Texas, 443 U.S. 49, 50 (1979).  "'[W]henever a police officer accosts an

individual and restrains his freedom to walk away, he has 'seized' that person.'" Id. (quoting Terry

v. Ohio, 392 U.S. at 16.  "Consideration of the constitutionality of such seizures involves a weighing

of the gravity of the public concerns served by the seizure, the degree to which the seizure advances

the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443

U.S. at 50-51.  "A central concern in balancing these competing considerations . . . has been to

assure that an individual's reasonable expectation of privacy is not subject to the arbitrary invasions

solely at the unfettered discretion of officers in the field."  Id. at 51.

"'[O]bviously, not all personal intercourse between policemen and citizens involves

'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has

in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

United States v. Mendenhall, 446 U.S. 544, 552 (1980)(quoting Terry v. Ohio, 392 U.S. at 19).  "As long as the person to whom questions are put remains free to disregard the questions and walk away there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  United States v. Mendenhall, 446 U.S. at 554.

The Supreme Court has provided the following "[e]xamples of circumstances that might indicate a seizure": "[T]hreatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  United States v. Mendenhall, 446 U.S. at 554. In United States v. Mendenhall, there was no seizure:

> The events took place in the public concourse.  The agents wore no uniforms and displayed no weapons.  They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents.  They requested, but did not demand to see the respondent's identification and ticket.  Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest.  The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions.

Id. at 555.  The Supreme Court also clarified in Brown v. Texas, explaining that, when the two officers approached Brown in the alley, asked him to identify himself and his reason for being there, and Brown refused to do so, there was no seizure.  See United States v. Mendenhall, 446 U.S. at 556. The Supreme Court characterized the Brown v. Texas decision as "simply [holding] . . . that because the officers had no reason to suspect Brown of wrongdoing, there was no basis for detaining him  . . . ."  Id.

An officer's display of a badge does not make an encounter into a seizure.  See United States v. Drayton, 536 U.S. 194, 204 (2002).  Likewise, the fact that an officer wears a sidearm does not

make an encounter a seizure, because "[t]hat most law enforcement officers are armed is a fact well known to the public.  The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  On the other hand, "[i]t is undoubtedly true that a consensual encounter between a citizen and police can be transformed into a seizure through persistent and accusatory questioning by police."  United States v. Williams, 356 F.3d 1268, 1274 (10th Cir. 2004).  See United States v. Williams, 356 F.3d at 1274 (holding that the defendant was not seized because: (i) "[t]he encounter occurred in a relatively open space . . . [and the defendant's] path of egress from the officers was at no time impeded[;] [ii] [n]one of the officers were uniformed nor did they at any time display a weapon"; and (iii) a reasonable person in the defendant's position would have felt free to terminate the encounter with the police).

In Florida v. Bostick, 501 U.S. 428 (1991), the Supreme Court noted:

> Drug interdiction efforts have led to the use of police surveillance at airports, train stations, and bus depots.  Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions.

501 U.S. at 431.  The officers in Florida v. Bostick boarded the defendant's bus to ask him questions and to seek permission to search his luggage.  See id.  They asked the defendant to inspect his ticket and identification.  See id.  They also explained their presence as narcotics agents on the lookout for illegal drugs.  See id.  They requested the defendant's consent to search his luggage.  See id.  "There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure."  Id. at 434.  "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage -- so long as the officers do not convey a message

-20-

that compliance with their requests is required."  <u>Id.</u> at 437.

"While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.  <u>I.N.S. v. Delgado</u>, 466 U.S. 210, 216 (1984).  The Tenth Circuit has explained:

> A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer.  If the individual is free to leave at any time during the encounter he or she is not seized under the Fourth Amendment. Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.  A person is seized only when that person has an objective reason to believe that he or she is not free to end the conversation with the officer and proceed on his or her way.

<u>United States v. Hernandez</u>, 93 F.3d 1493, 1498 (10th Cir. 1996)(internal citations omitted).  The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment.  They include:

> [i]  The threatening presence of several officers; [ii] the brandishing of a weapon by an officer; [iii] some physical touching by an officer; [iv] the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; [v] prolonged retention of a person's personal effects; [vi] a request to accompany the officer to the station; [vii] interaction in a nonpublic place or a small, enclosed space; [viii] and absence of other members of the public.

<u>Jones v. Hunt</u>, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotations omitted). The Tenth Circuit has "refused to treat any of the factors cited above as dispositive."  <u>Id.</u>  "Nor are these factors exclusive."  <u>Id.</u>  Instead, the Court, "[w]hen viewing the totality of the circumstances, it may be that the strong presence of two or three factors demonstrates that a reasonable person would not believe that he was not free to terminate an encounter with government officials."  <u>Id.</u>  "Asking questions which may elicit incriminating answers is irrelevant to a determination of whether an encounter was consensual, although the manner in which the questions are asked is relevant; accusatory, persistent,

and intrusive questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required." Id. at 1499 (internal quotations omitted).

That questioning takes place in a patrol car or a confined space out of public view is relevant to whether an encounter is detention, but is not determinative on its own. See United States v. Hernandez, 93 F.3d at 1499. In United States v. Little, 60 F.3d 708 (10th Cir. 1995), the Tenth Circuit held that the defendant was detained and that the encounter was not consensual when it took place in a confined space outside of the public view, the questioning was accusatory, persistent, and intrusive, the officer did not advise the defendant that she could refuse to answer his questions, and, when the officer asked her to accompany him to the baggage area, the officer did not advise her that she was under no compulsion to do so. See id. at 714. On the other hand, in United States v. Hernandez, the Tenth Circuit held that the defendant was not detained where she was asked a limited number of routine questions about travel plans, relationship to passengers, a question about possession of contraband, and a request to search. See 93 F.3d at 1499.

In Jones v. Hunt, the plaintiff sought relief under 42 U.S.C. § 1983 for alleged violations of her Fourth Amendment rights arising from her seizure by two state government officials at her high school, where she was a student. See 410 F.3d at 1223. The Tenth Circuit viewed the encounter through the eyes of a reasonable sixteen year old. See id. at 1226. The Tenth Circuit determined that Jones was ordered to go to a school counselor's office, where the state officials repeatedly threatened to arrest her. See id. at 1226-27. "A reasonable high school student would not have felt free to flaunt a school official's command, leave an office to which she had been sent, and wander the halls of her high school without permission." Id. at 1227. The Tenth Circuit acknowledged that "[i]t is possible that Jones' initial encounter with [state officials] was consensual. Regardless, it was transformed into a seizure through [the state officials]' alleged threats and demands." Id. (citing

-22-

United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994)).

The Tenth Circuit has held that a plaintiff was not seized when an agent entered the plaintiff's bedroom even though the encounter took place "very early in the morning, in a nonpublic place with no other individuals present" and the agent "did not advise [the plaintiff] that he was free to disregard the agent's request, because the encounter was "calm and orderly with no show of force or physical touching" and "a reasonable person in [the plaintiff's] position would have felt free to terminate the encounter with [the agent]." See United States v. Abdenbi, 361 F.3d 1282, 1292 (10th Cir. 2004).   See Ramos v. Carbajal, 508 F.Supp.2d 905, 922-23 (D.N.M. 2007)(holding that the plaintiff was not seized where he did not contend that more than one officer approached him, he saw the officer's gun in his holster, but did not suggest that the officer brandished it, the officer grabbed the plaintiff's arm and led him out of an area, there was no allegation of aggressive or commanding language, and the plaintiff never alleged that he was confined, taken into custody, or put in a position where he was not otherwise free to terminate the encounter); Caputo v. Rio Rancho Police Dep't, No. CIV 05-321 JB/DJS, 2006 WL 4063020 at *6 (D.N.M. June 30, 2006)(Browning, J.)(holding that the plaintiff was not unlawfully seized when he was held for questioning at a police station, because the plaintiff was asked, not ordered, to come to the station for questioning, the plaintiff came of his own volition to the station, and he was not placed under arrest while at the station).

An officer may seize a person by using  physical force on him.  See United States v. Harris, 313 F.3d 1228, 1235 (10th Cir. 2002).  In United States v. Harris, the defendant ignored an officer and continued walking both times that the officer requested the defendant's identification.  See 313 F.3d at 1235.  The officer then ordered the defendant to remove his hands from his pockets, and when the defendant failed to do so, the officer removed the defendant's "hands from his pockets, and

-23-

escorted him to the front part of his police car." Id. at 1234.  The Tenth Circuit noted that "[a] police officer's assertion of authority without submission by the individual does not constitute a seizure." Id. (citing Bella v. Chamberlain, 24 F.3d 1251, 1255 (10th Cir. 1994)).  "Accordingly, Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car." United States v. Harris, 313 F.3d at 1235.

An officer may seize a person by requesting a person's identification and then not returning it to him.  See United States v. Lopez, 443 F.3d 1280, 1285 (10th Cir. 2006).  In United States v. Lopez, an officer approached two men he saw standing in the middle of a street next to a car with its engine running.  See 443 F.3d at 1282.  The officer testified he decided to contact the two men because it was very early in the morning and the street the men were on borders a high-crime area. See id. Before approaching the men, the officer checked the license plate of the car and determined it had not been reported stolen.  See id.  The officer stopped his car approximately twenty feet from the men and asked them for identification.  See id.  The officer took the license of one of the men, Lopez, and returned to his car to do a warrants check.  See id.  The warrants check revealed Lopez had an outstanding warrant.  See id.  The officer called for back up and then arrested Lopez.  See id.  The officer searched Lopez upon his arrest and found crack cocaine in his pants pocket.  See id.  The Tenth Circuit noted "the Fourth Amendment is not implicated when an officer approached an individual in a public place and requests, but does not demand, to see his identification."  Id. at 1285 (citing United States v. Mendenhall, 446 U.S. at 555).  The Tenth Circuit explained: "The Supreme Court has also made clear, however, that an individual 'may not be detained even momentarily without reasonable, objective grounds for doing so." United States v. Lopez, 443 F.3d at 1285 (quoting Florida v. Royer, 460 U.S. 491, 498 (1983)).  The Tenth Circuit held that Lopez

was seized at the time of the warrants check, because the officer "not only held Lopez'[ ] license for longer than necessary to confirm Lopez'[ ] identification, he specifically instructed Lopez to remain by his vehicle while he ran the warrants check and then took Lopez'[ ] license back to his patrol car, thereby rendering Lopez unable to leave." United States v. Lopez, 443 F.3d at 1286.  The Tenth Circuit concluded that a reasonable person in Lopez' position would not have felt free to terminate the encounter with the officer, and thus Lopez was seized by the officer.  See id.

   B.    **REASONABLE SUSPICION.**

   An officer must have reasonable suspicion to detain a person for investigation.  See Terry v. Ohio, 392 U.S. 1, 20 (1968). "'The government bears the burden of showing that an officer possessed objectively reasonable and articulable suspicion.'" United States v. Grant, No. CR 05-2511 JB, 2006 WL 1305037, at * 5 (D.N.M. Apr. 10, 2006)(Browning, J.)(quoting United States v. Sieren, 68 Fed.Appx. 902, 904 (10th Cir. 2003)).  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu,534 U.S. 266, 274 (2002).

   The Fourth Amendment demands that the detaining officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry v. Ohio, 392 U.S. at 21. "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. at 27.   The Tenth Circuit determines the reasonableness of an investigative detention by applying a two-prong test: (i) whether the officer's action was justified at its inception; and (ii) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. See United States v. Shareef, 100 F.3d 1491, 1500 (10th

Cir. 1996).

The court must look at the totality of the circumstances to determine whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  See United States v. Arvizu, 534 U.S. at 273.   "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."  United States v. Arvizu, 534 U.S. at 277.  "Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer."  United States v. Gutierrez-Daniez, 131 F.3d 939, 942 (10th Cir. 1997). "This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  United States v. Arvizu, 534 U.S. at 273.

When assessing the reasonableness of the officer's actions, the court must "judge the officer's conduct in light of common sense and ordinary human experience."  United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)(citations omitted).  "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."  Illinois v. Wardlow, 528 U.S. at 125.  "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate defense to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  United States v. Gutierrez-Daniez, 131 F.3d at 942.

It may be appropriate at times to look at officers' collective knowledge in determining whether they behaved reasonably.  See United States v. Shareef, 100 F.3d at 1504.  The presumption of communication is rebutted if information was not, in fact, shared.  See id.  Further, "[w]hen an officer is conducting a lawful investigative detention based on  reasonable suspicion of criminal activity, the officer may ask for identification and for an explanation of the suspect's presence in the

area." Oliver v. Woods, 209 F.3d at 1189.

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. See United States v. Gutierrez-Daniez, 131 F.3d at 942 ("[A]n area's disposition towards criminal activity is an articulable fact that may be considered along with more particularized factors to support reasonable suspicion.")(internal quotations omitted). See United States v. Fernandez, 388 F.3d 1256, 1265 (10th Cir. 2004), cert. denied, 544 U.S. 1043 (2005)("[M]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion. . . ."). On the other hand, "[g]eneral profiles that fit large numbers of innocent people do not establish reasonable suspicion." United States v. Grant, 2006 WL 1305037, at * 6 (internal quotations omitted).

That travel by a defendant has commenced in a city "known for drug trafficking, may factor into the assessment." United States v. Hernandez-Dominguez, 1 Fed.Appx. 827, 832 (10th Cir. 2001), cert. denied Hernandez-Dominguez v. United States, 532 U.S. 950 (2001)(citing United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986)). "Pagers and cellphones, again, while not dispositive, may be indicative of illegal activity because they are known tools of the drug trade." United States v. Hernandez-Dominguez, 1 Fed.Appx. at 832 (citing United States v. Slater, 971 F.2d 626, 637 (10th Cir. 1992)(stating that, a "cellular phone . . . is a recognized tool of the trade in drug dealing.").

The Tenth Circuit has repeatedly held that "nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness

. . . as a basis for reasonable suspicion in all cases of this kind must be treated with caution." United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994)(internal quotations omitted).  "'It is common knowledge that most citizens, especially aliens, whether innocent or guilty, when confronted by a law enforcement officer who asks them potential incriminating questions are likely to exhibit some signs of nervousness.'" Id. (quoting United States v. Millian-Diaz, 975 F.2d 720, 722 (10th Cir. 1992).  See United States v. Fernandez, 18 F.3d at 879; United States v. Peters, 10 F.3d 1517, 1521 (10th Cir. 1993)("'While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials . . . .'")(quoting United States v. Hall, 978 F.2d 616, 621 n. 4 (10th Cir. 1992)); United States v. Walker, 933 F.2d 812, 817 n. 3 (10th Cir. 1992)("The general term "nervousness" encompasses an almost infinite variety of behaviors. No doubt there are circumstances in which an individual's nervous behavior would give rise to a reasonable suspicion of criminal activity.'), cert. denied, 502 U.S. 1093 (1992).  The Tenth Circuit has cautioned that a district court's "heavy reliance on nervousness as an important factor establishing reasonable suspicion is even more troublesome given the complete lack of evidence in the record that [the officer] had any prior knowledge of [the defendants] to make an evaluation of their behavior." United States v. Fernandez, 18 F.3d at 879.

Inconsistent answers to routine questions may give rise to a reasonable suspicion.  See United States v. Martinez, 230 Fed.Appx. 808, 812-13 (10th Cir. 2007)("Slightly conflicting answers . . . may establish a particularized and objective basis for reasonable suspicion, notwithstanding that each of the factors alone is susceptible to innocent explanation."); United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001)(noting that "implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity.").  The Tenth Circuit has noted, however, that

inconsistent answers do not always give rise to reasonable suspicion.  In <u>United States v. Santos</u>, 403

F.3d 1120 (10th Cir. 2005), the  Tenth Circuit explained:

> But the inconsistencies and gaps in [the defendant's] story were not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing. Many modern people, even innocent ones, program important phone numbers into their telephones and no longer memorize them. It may be lamentable that an uncle would not know the ages of his nieces and nephews, but it is hardly an indication that crime is afoot. Moreover, many motorists, even innocent ones, might think it none of the trooper's business how long they were going to stay in New York, or where their sisters worked, or why their recently divorced sisters are planning to move to California, or what work they might get when they arrive.  The Supreme Court has repeatedly held that refusal to answer law enforcement questions cannot form the basis of reasonable suspicion. <u>See Florida v. Bostick</u>, 501 U.S. 429, 437 . . . (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.") (citing <u>INS v. Delgado</u>, 466 U.S. 210, 216-17 . . . (1984); <u>Florida v. Royer</u>, 460 U.S. 491, 498, . . . (1983) (plurality); <u>Brown v. Texas</u>, 443 U.S. 47, 52-53, . . . (1979)). Vague answers may sometimes be a polite way to sidestep impertinent questions. This might also explain [the defendant's] attempt to shift the subject to the weather. We therefore do not give much independent weight to this factor. But in conjunction with other factors, it contributed to Trooper Peech's determination of reasonable suspicion.

403 F.3d at 1131.

Lastly, a court may not "engage in a 'divide-and-conquer analysis', evaluating and disposing of each factor individually."  <u>United States v. Karam</u>, 496 F.3d 1157, 1165 (10th Cir. 2007)(quoting <u>United States v. Arvizu</u>, 534 U.S. at  274).  The court "must consider the factors as a whole, giving due weight to the reasonable inferences of the resident district court and to [the officer's] expertise." <u>United States v. Santos</u>, 403 F.3d at 1133. "Even factors which are not alone probative of illegal conduct may combine to amount to reasonable suspicion."  <u>United States v. Karam</u>, 496 F.3d at 1165.

### C.      PROBABLE CAUSE.

An arrest is characterized by highly intrusive or lengthy search or detention, and must therefore be supported by probable cause. Probable cause to arrest exists only

when the "facts and circumstances within the officers' knowledge, and of which they
have reasonably trustworthy information, are sufficient in themselves to warrant a
man of reasonable caution in the belief that an offense has been or is being
committed.

United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(internal citations and quotations

omitted).  "To determine if probable cause exists, a court looks to "whether at that moment the facts

and circumstances within [the officer's]  knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent [officer] in believing that the petitioner had

committed or was committing an offense."   United States v. Snow, 82 F.3d 935, 942 (10th Cir.

1996)(internal quotations omitted).   "[P]robable cause must exist at the moment of the arrest."

United States v. Hansen,  652 F.2d 1374, 1388 (10th Cir. 1981).

        Probable cause is "evaluated in light of circumstances as they would have appeared to a

prudent, cautious, trained police officer."  Id. (internal quotations omitted).  "Probable cause exists

where the facts and circumstances within an officer's knowledge and of which he had reasonably

trustworthy information are sufficient to warrant a prudent [officer] in believing that an offense has

been or is being committed. This is an objective standard; the subjective belief of an individual

officer as to whether there is probable cause is not dispositive. " Boydston v. Isom, 224 Fed.Appx.

810, 814 (10th Cir. 2007)(internal citation and quotations omitted).  "Probable cause to arrest does

not require facts sufficient to establish guilt, but does require more than mere suspicion."  United

States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998), cert. denied, 525 U.S. 978 (1998).

        The quantum of evidence sufficient to satisfy probable cause is higher than that for

reasonable suspicion.  As the Tenth Circuit stated in United States v. Valenzuela, 365 F.3d 892 (10th

Cir. 2004): "Reasonable suspicion is a less demanding standard than probable cause not only in the

sense that reasonable suspicion can be established with information that is different in quantity or

content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Id. at 896 (quoting Alabama v. White, 496 U.S. 325, 330 (1990))."That the facts may not support a conclusion that [the defendant] actually violated the law is irrelevant; reasonable suspicion requires a showing considerably less than preponderance of the evidence, and may be justified on a quantum of evidence far less than that required to establish probable cause ." United States v. Vercher, 358 F.3d 1257, 1263 (10th Cir. 2004)(internal citation and quotations omitted).

"[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004). Probable cause may be based on the collective information of the officers involved in the arrest, "rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest." Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985). In Karr v. Smith, the facts within the arresting officers' knowledge based upon a sergeant's knowledge were "sufficient to warrant a prudent man in believing that an offense had been committed" because the evidence showed that the sergeant was present at the scene and saw damage to a truck, saw that tires had been slashed and the valves of the truck opened to allow hazardous materials to leak out, based on his observations, he determined the damage was intentional, the truck owner told the sergeant he knew that Karr had done the damage and had threatened to vandalize the truck, and that he intended to pursue prosecution against Karr himself. See 774 F.2d at 1031-32. The arresting officers arrested Karr based upon the orders of the sergeant. See id. at 1032. The arresting officers were deemed to have whatever knowledge the sergeant had. See id.

A court may not "arrive at probable cause by simply piling hunch upon hunch." Id. at 897.

"To defer to an officer's interpretation of the facts without applying judgment informed by the Fourth Amendment would eviscerate the need for a judicial determination of probable cause."  Id. at 902.  "[A]ssociation with known or suspected criminals is not enough in itself to establish probable cause."  United States v. Hansen, 652 F.2d at 1388.  See United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996)(holding that officers had probable cause to arrest a defendant based upon cocaine discovered in the backpack of his cohort, his cohort's "beeline" to his car, the defendant's apparent haste to leave the parking lot upon sighting one of the police officers, and his nervousness in talking with an officer).

Probable cause to arrest exists when officers have reliable and trustworthy information.  See Draper v. United States, 248 F.2d 295, 298-99 (10th Cir. 1957)(holding that agents had probable cause to arrest the defendant based upon information coming from a special employee of the Bureau of Narcotics where that employee had previously furnished information that was reliable and trustworthy; the employee gave the defendant's address, a description of the defendant's race, complexion, age, weight, dress, walk, and bag he carried, the time of the defendant's departure from Denver, and the defendant's destination, the time of the defendant's return, and his mode of travel; the arresting agents verified that information by observing the defendant after he left the train, and after his detention by agents, two glassine paper bags with heroin and a hypodermic syringe were found on the defendant), aff'd, 358 U.S. 307 (1959).

Probable cause to arrest may be based upon a verified description given to an officer.  See United States v. Klein, 93 F.3d 698, 701 (10th Cir. 1996).  In United States v. Klein, the arresting officer's had information from an informant that a man named Bruce was selling methamphetamine out of a home located at a specific address.  See id. at 700-701.  When the officers executed a search warrant upon that address, they were told by a woman in the house they were searching that a man

named Bruce lived at that address and trafficked methamphetamine.  See id. at 700.  Another woman, who arrived at the house, confirmed Bruce was a trafficker of methamphetamine, and gave a physical description of Bruce, the clothing he was wearing that day, and a description of her car, that Bruce was purportedly driving.  See id.  That woman also told the officers that Bruce could be found at a particular store.  See id. at 701.  Upon arriving at the store, the officers observed the defendant, and matched him to the description given to them by the informant and the two women at the house.  See id.  Under those circumstances, the officers had probable cause to arrest the defendant, because "[t]hat the officers did not know [the defendant's] actual identity until after they arrested him is of no moment."  Id.

An officer has probable cause to arrest a person when that person has purchased a one-way ticket with cash, was traveling under a different name, was carrying large amounts of cash and had in his possession two brick-shaped, cellophane-wrapped items packaged in a way commonly used to transport narcotics.  See United States v. Gordon, 173 F.3d 761, 767 (10th Cir. 1999).  In United States v. Gordon, 173 F.3d 761 (10th Cir. 1999).  In United States v. Gordon, the defendant argued that the officer lacked probable cause to arrest him because he "focus[ed] narrowly on [the officer's] failure to establish before the arrest that the cellophane-wrapped packages contained cocaine."  Id. at 766. The defendant "in essence ask[ed] [the Tenth Circuit] [to]. . . fundamentally alter the nature of the probable cause requirement from one based on a reasonably fair likelihood of criminal conduct to one satisfied only upon a positive showing of criminal conduct."  Id.  The Tenth Circuit held that  the officer had probable cause to arrest, and that the combination of facts in United States v. Gordon were sufficient to lead a "reasonable officer to believe [the defendant] was committing or had committed a crime."  Id. at 767.

Probable cause to arrest may also be based upon narcotics found in a companion's bag, and

pointing officers out to a companion.  See United States v. Bojorquez-Gastelum, 94 F.3d 656

(Table), No. 96-1004, 1999 WL 466659 at *3 (10th Cir. Aug. 16, 1996).  In United States v.

Bojorquez-Gastelum, the officers' suspicions was first roused by the defendant briefly making eye

contact with a DEA officer working on narcotics interdiction at an airport, and then rapidly looking

away.  See id. at *1.  The defendant and his companion looked at the area where the officers stood.

See id. at *2.  The defendant again looked at the officers as he was traveling down the escalator and

then proceeded quickly to the doorway, which the officers interpreted as an attempt to hide.  See id.

The defendant and his companion accompanied the officers, however, to a Narcotics Unit Office and

gave officers permission to search their luggage.  See id. The defendant told the officers that the bag

that he carried with him was his only luggage, whereas his companion indicated that the duffel bag

that he carried belonged to both of them.  See id.  The officers searched both bags and found

approximately 800 grams of cocaine in the duffel bag.  See id.  The Tenth Circuit held that the

officers had probable cause to arrest the defendant because

> the police knew that [the defendant] and his companion were traveling together.
> [The officers] witnessed [the defendant] pointing the officers out to his companion
> before the pair proceeded to the train platform, and continuing to observe their
> movements as they rode the escalator to the platform.  Although it is true that, at this
> point, [the] defendant did not know that the persons observing him were police
> officers, a person of reasonable caution can believe that a drug courier might be
> concerned about surveillance by persons other than police officers.  Most
> significantly, the drugs were found in a bag that defendant's companion had indicated
> belonged to both of them.

Id.  The Tenth Circuit concluded that, "[u]nder these circumstances, the police had probable cause

to believe that [the defendant] was involved in the transport of cocaine."  Id.

Mere presence at the scene of a crime is not sufficient for probable cause to arrest.  See

United States v. Najera, 165 Fed.Appx. 700, 704 (10th Cir. 2006).  "The central issue in [United

States v. Najera] [was] whether the totality of circumstances pointed specifically to [the defendant]

or whether he was implicated by his mere presence at the scene of the crime." Id.  The Tenth Circuit held that probable cause existed to arrest the defendant, because "a number of facts beyond [the defendant's] mere presence . . . gave the police probable cause to believe that he was involved in the drug transaction." Id.  The officers knew that someone other than the person they caught with the controlled delivery of 571 pounds of marijuana, was involved.  See id. at 702, 704.  The person they caught told the agent he was unloading the truck for other people.  See id. at 704.  The farm where the controlled delivery took place was closed for the day and in a remote part of town.  See id.  Thus, "[t]he only reason for [the defendant's] presence was in connection with the drug transaction, and nothing points to an innocent explanation or even coincidence." Id. at 705.

While mere association between a defendant and his brother found in possession of cocaine base is insufficient to establish probable cause by itself, the fact that the defendant paid cash for a one-way ticket from a source city, shared a room with his brother, and his deliberate presence in the doorway of a train compartment that officers were searching and keen interest in the officer's search of his brother's stereo containing the cocaine base was sufficient for probable cause.  See United States v. Lacy, 17 Fed.Appx. 747, 748, 750 (10th Cir. 2001).  DEA officers were interdicting drugs at the Albuquerque train station.  See id. at 747.  "They were on the look out for reservations that fit drug trafficking profiles (i.e. reservations made soon before the time and date of departure, for one way tickets that were paid for in cash)." Id.  The officers focused on the defendant and his brother because they bought their tickets with cash, missed their original train, and had to take the next day's train instead.  See id.  The Tenth Circuit held that the defendant's arrest was supported by probable cause because the trial court relied upon factors other than his proximity to drugs and association with criminals, including: the fact that he paid cash for a one-way ticket from a source city and was deliberately present during the officers' search of his brother's stereo containing the

drugs.  See id. at 750.

**D.      THE EXCLUSIONARY RULE.**

Evidence is not considered "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. at 487-88. "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence." United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001)(internal quotations omitted). Once the defendant has made those showings, then the government must prove that the evidence the defendant seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." Id. (internal quotations omitted).  A defendant must at least show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." Id. (internal quotations omitted).

**E.      CELLULAR TELEPHONE SEARCHES.**

A federal district court within the Tenth Circuit has held that a warrantless search of the memory of a defendant's cellular telephone was permissible when the cellular telephone was seized incident to the arrest of the defendant, because "it is properly within the scope of an inventory search." United States v. Parada, 289 F.Supp.2d 1291,1303 (D.Kan. 2003).  The court noted it is a "separate question . . . whether it [is] permissible for officers to note the numbers of incoming

phone calls stored in the cell phone memory."   Id.   In United States v. Parada it was permissible for

the officers to record the numbers of incoming calls to the defendant's cellular telephone because

> the evidence indicated that exigent circumstances justified the retrieval of phone
> numbers.  Because a cell phone has a limited memory to store numbers, the
> agent recorded the numbers in the event that subsequent incoming calls effected the
> deletion or overwriting of the earlier stored numbers.  This can occur whether the
> phone is turned on or off, so it is irrelevant whether the defendant or the officers
> turned on the phone.  The Court concludes that under these circumstances, the agent
> had the authority to immediately search or retrieve, as a matter of exigency, the cell
> phone's memory of stored numbers of incoming phone calls, in order to prevent the
> destruction of this evidence.

Id. at 1303-1304.

     In United States v. Park, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007),

a federal district court determined that the warrantless searches of the defendants' lawfully seized

cellular telephones were not justified as searches incident to the defendants' arrests.  See id. at **

8-9.  The court reasoned that "[i]ndividuals can store highly personal information on their cell

phones, and can record their most private thoughts and conversations on their cell phones through

email and text, voice and instant messages." Id. at * 8.  The court reasoned that "[t]he searches at

issue . . . [went] far beyond the original rationales for searches incident to arrest, which were to

remove weapons to ensure the safety of officers and bystanders, and the need to prevent

concealment or destruction of evidence." Id.  "Officers did not search the phones out of a concern

for officer safety, or to prevent the concealment or destruction of evidence.  Instead, the purpose was

purely investigatory." Id.  The court distinguished cases upholding searches of pagers, because "the

government does not contend, and the record does not show, that the searches of defendants' cell

phones were necessary to prevent the destruction of evidence." Id. at * 9.  The court also did not

find the searches justified as part of booking procedure.  See id.  The court found that the United

States did not meet its burden to demonstrate by a preponderance that "it is standard police practice

to search contents of a cellular phone as part of the booking process" when it did "not submit[ ] any police department guidelines or criteria showing that it is standard practice to search the contents of cellular phones as part of the booking procedure." Id. at *10.  The court noted that booking searches are usually conducted "to deter theft of arrestees' property and false claims of theft by arrestees, and to identify contraband and other items." Id.  The court reasoned that purpose could have been fulfilled by "listing the defendants' cell phones as items on the booking forms." Id.  See United States v. Finley, 477 F.3d 250, 254, 259-60 (5th Cir. 2007)(upholding warrantless search of a defendant's cellular telephone call records and text messages as a search incident to that defendant's arrest where the defendant was arrested at the scene of the traffic stop, and the cellular telephone search took place after that arrest), cert. denied, --- U.S. ---, 127 S.Ct. 2065 (2007); United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996)(upholding a warrantless activation and retrieval of information from a pager "[b]ecause of the finite nature of a pager's electronic memory, incoming pages may destroy currently stored telephone numbers in a pager's memory," and "[t]hus, it is imperative that law enforcement officers have the authority to immediately 'search' or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence."), cert. denied, 519 U.S. 900 (1996); United States v. Meriwether, 917 F.2d 955, 958 (6th Cir. 1990)(upholding the seizure of the defendant's telephone number from a pager as within the scope of a warrant that authorized agents to search for and seize "telephone numbers of customers, suppliers, couriers," while noting that "[t]he digital display pager, by its very nature, is nothing more than a contemporary receptacle for telephone numbers."); United States v. Dennis, Criminal No. 07-008-DLB, 2007 WL 3400500, at **7-8 (E.D.Ky. Nov. 13, 2007) (upholding warrantless search of a defendant's cellular telephone call history log as a search incident to arrest); United States v. Diaz, No. CR 05-0167, 2006 WL 3193770, at **2, 4-5 (N.D. Cal. Nov. 2, 2006)(upholding warrantless

retrieval of information from the defendant's cellular telephone, including the officer turning the cellular telephone on, writing down names and phone numbers in the cell phone's address book, because the cellular telephone was searched incident to the defendant's booking, because of the defendant's status as a probationer, and because of the limited life of a cellular telephone's battery which could block access to the information later); United States v. Allen, No. 3:04cr123, 2005 WL 5574429, at **3, 6 (S.D. Ohio Mar. 15, 2005)(holding that warrantless retrieval of information from defendants' five cellular telephones, including dates and times of numbers called, the dates and times of calls received, and the names and phone numbers inside the address books of each cellular telephone was justified by exigent circumstances, because one of the cellular telephones had rung at least 40 times, and the memory of a cellular telephone is limited).

## ANALYSIS

The Court finds that the initial encounter between Gutierrez and the DEA officers was a consensual encounter, but that the consensual encounter ripened into an investigative detention. The Court also finds that reasonable suspicion supported the officers' investigative detention of Gutierrez. The Court further finds that Dunlap had probable cause to arrest Gutierrez.

## I.   THE INITIAL INTERACTION BETWEEN GUTIERREZ AND DUNLAP WAS A CONSENSUAL ENCOUNTER.

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." United States v. Mendenhall, 446 U.S. at 552. A court should consider factors such as "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be

compelled." United States v. Mendenhall, 446 U.S. at 554.

Dunlap's encounter with Gutierrez at the bus station was similar to the encounter involved in United States v. Mendenhall.  The encounter took place in a public space -- outside the bus terminal -- like the public concourse in United States v. Mendenhall.  Compare 446 U.S. at 555 with Tr. at 20:5-9 (Dunlap).  Dunlap approached Gutierrez and identified himself as an officer, and did not "summon [the defendant] to [his] presence." United States v. Mendenhall, 446 U.S. at 555; Tr. at 20:10-18 (Ramirez & Dunlap); id. at 20:24-21 (Dunlap).

Dunlap also asked Gutierrez permission to speak with him.  See Tr. at 20:10-18 (Ramirez & Dunlap); id. at 20:24-21 (Dunlap).  Dunlap then asked Gutierrez why he was at the bus station, see id. at 21:13 (Dunlap), and Gutierrez told him he was there to pick up his wife, who had come in on the bus from El Paso, see id. at 21:14-15 (Dunlap).  Dunlap then asked Gutierrez where, if she arrived on the bus, his wife was.  See id. at 21:15-16 (Dunlap).  Gutierrez responded he did not know.  See id. at 21:18 (Dunlap).  Dunlap then asked Gutierrez for identification, see id. at 21:20-21 (Dunlap) and Gutierrez produced a New Mexico driver's license, see id. at 21-22 (Dunlap).

Dunlap, did not seize Gutierrez "simply by reason of the fact that [he] approached [Gutierrez], asked [him] if [he] would show [Dunlap] . . . identification, and posed to [him] a few questions."  United States v. Mendenhall, 446 U.S. at 555.  There was no evidence that Dunlap's questioning of Gutierrez was "persistent and accusatory."  United States v. Williams, 356 F.3d at 1274.  Because Dunlap sought permission from Gutierrez to speak with him, there is no indication that Dunlap "convey[ed] a message that compliance with [his] requests [were] required."  Florida v. Bostick, 501 U.S. at 437.

Dunlap did not seize Gutierrez at their initial encounter at the bus depot; however, "[a] consensual encounter may escalate into an investigative detention.  An investigative detention may

escalate into a full-blown arrest or it may de-escalate into a consensual encounter.  A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage." United States v. Shareef, 100 F.3d at 1500.

Dunlap acknowledges that he, Dorian, and Bassett decided to detain Gutierrez, Fuentes-Ontiveros, and Vega, and transport them to the DEA office.  See Tr. at 24:11-14 (Dunlap).  On the other hand, the United States contends that not until after Dunlap called the telephone number from "Pelon" in Vega's address book, Gutierrez' cellular telephone began ringing, and Dunlap had confirmed that the caller identification on Gutierrez' cellular telephone showed the telephone number that Dunlap was calling from did the officers place Gutierrez under arrest.  See Response, at 12-13.  Assuming that Dunlap subjected Gutierrez to an investigative detention, Dunlap must have had a reasonable suspicion to justify that detention.

## II.  **DUNLAP HAD REASONABLE SUSPICION TO DETAIN GUTIERREZ.**

The Court determines reasonableness of an investigative detention by determining: (i) whether the officer's action was justified at its inception; and (ii) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. See United States v. Shareef, 100 F.3d at1500.  An officer's investigatory detention is justified only if supported by reasonable suspicion. See Terry v. Ohio, 392 U.S. at 20 (stating that an officer must have reasonable suspicion to detain a person for investigation).

The United States bears the burden of showing that an officer objectively possessed a reasonable and articulable suspicion. See United States v. Grant, 2006 WL 1305037, at *5.  The Court looks to a totality of the circumstances to determine whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. See United States v. Arvizu, 534 U.S. at 273.  Once Dunlap, Dorian, and Bassett detained Gutierrez, and Fuentes-Ontiveros, and

transported them to the DEA office, they subjected Gutierrez to an investigative detention that must be supported by reasonable suspicion. The United States contends that Dunlap had reasonable suspicion to justify Gutierrez' detention because: (i) at the time that Dunlap encountered Gutierrez, Dunlap was aware that couriers traveled from El Paso to Texas smuggling heroin inside soles of shoes; (ii) when couriers did this smuggling, they traveled with no luggage; (iii) the courier was often picked up at the station and then driven to a local department store to buy new shoes. See Response at 10-11. Dunlap testified about that pattern of smuggling narcotics in shoes: "Usually the person who is wearing the shoes arrives and is picked up by someone else. Usually they're transported somewhere else for a short period of time where they get a new pair of shoes or the illegal substance is taken out of their shoes. Then generally they return to wherever they came from originally within a short period of time." Tr. at 7:9-14 (Dunlap). While Dunlap testified that in the past eighteen months not very many people have been arrested for smuggling narcotics in footwear, see id. at 6:22-25 (Ramirez & Dunlap), he was familiar with DEA seizures in the eighteen months before April 25, 2007, that seized narcotics smuggled in persons' footwear, see id. at 6:18-21 (Ramirez & Dunlap).

Vega told Dunlap he was coming from the El Paso area. See id. at 12:24-25 (Dunlap). Dunlap testified that the El Paso/Juarez area is known to him as a source city for illegal narcotics. See id. at 6:4-7 (Ramirez & Dunlap). The fact that travel by a defendant has commenced in a city "known for drug trafficking, may factor into the assessment." United States v. Hernandez-Dominguez, 1 Fed.Appx. 827, 832 (10th Cir. 2001)(citing United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986)).

The only luggage that Vega carried was a small, black, soft-sided cooler. See Tr. at 14:4-5 (Dunlap). When Dunlap opened it, he discovered a black jacket, a small type of an unknown type

of medication, and a burrito.  See id. at 15:5-8 (Dunlap). While "[g]eneral profiles that fit large numbers of innocent people do not establish reasonable suspicion,"  United States v. Grant, 2006 WL 1305037, at * 6 (internal quotations omitted), the United States contends that couriers smuggling drugs in their shoes do not carry luggage. See Response, at 10.  While alone this factor would not establish reasonable suspicion, the Court may give it some weight in consideration with other factors.

After Dunlap discovered narcotics in Vega's shoe and placed Vega under arrest, see Tr. at 16:22-23 (Dunlap), Vega said he was there to drop off the shoes, see id. at 18:18-19 (Dunlap). Vega also said that he made a telephone call when he arrived at the bus station and was told to wait in front of the bus station by the person he called.  See id. at 18:19-22 (Dunlap).  Vega said he did not know exactly what the person looked like because he had never met him before.  See id. at 18:23-24 (Dunlap).The only thing that Vega knew was that the person's name was "Pelon."  Id. at 18:24-25 (Dunlap).  Vega never gave Dunlap a physical description of "Pelon." Id. at 35:25-36:2 (Chavez & Dunlap).  Dunlap believed that "Pelon" means bald or balding in Spanish. Id. at 36:4-6 (Dunlap).

After he received this information from Vega, Bassett relayed information to Dunlap that he witnessed a small, red Volkswagen Jetta go through the area several times and then park across the street from where they had originally found Vega.  See id. at 19:8-12 (Dunlap).  Bassett told Dunlap that he saw a person driving back and forth out front who was bald and told Dunlap it could be the person coming to pick up Vega. See id. at 88:18-22 (Bassett).  While "[m]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion. . . ," United States v. Maddox, 388 F.3D 1256, 1265 (10th Cir. 2004), the Court may consider Gutierrez' lack of hair as a factor in its reasonable suspicion analysis.

Dunlap observed Gutierrez who appeared to be walking from the vehicle.  See Tr. at 20:3-4

(Dunlap).  Gutierrez was bald.  <u>See</u> <u>id.</u> at 20:4 (Dunlap).  Dunlap stopped Gutierrez because he appeared to be bald.  <u>See</u> <u>id.</u> at 39:22-24 (Chavez & Dunlap).

Dunlap asked Gutierrez why he was at the bus station.  <u>See</u> <u>id.</u> at 21:13 (Dunlap).  Gutierrez told Dunlap he was there to pick up his wife, who had come in on the bus from El Paso.  <u>See</u> <u>id.</u> at 21:14-15 (Dunlap).  Dunlap then asked Gutierrez, if she had arrived on the bus, where his wife was.  <u>See</u> <u>id.</u> at 21:15-16 (Dunlap).  Gutierrez told Dunlap he did not know.  <u>See</u> <u>id.</u> at 21:18 (Dunlap).

Inconsistent answers to routine questions may give rise to a reasonable suspicion.  <u>See</u> <u>United States v. Martinez</u>, 230 Fed.Appx. 808, 812-13 (10th Cir. 2007)("Slightly conflicting answers . . . may establish a particularized and objective basis for reasonable suspicion, notwithstanding that each of the factors alone is susceptible to innocent explanation.").  Gutierrez' answers, however, were not necessarily contradictory, because Dunlap encountered Gutierrez before Gutierrez entered the bus depot.  <u>See</u> Tr. at 45:24-46:4 (Dunlap & Chavez). Dunlap also acknowledged that it was not unusual behavior for persons to look for somebody at the bus depot.  <u>See</u> Tr. at 46:13-15 (Dunlap & Chavez).

Gutierrez' answers to Dunlap were not necessarily inconsistent, and any  "inconsistencies and gaps in [Gutierrez'] story were not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing."  <u>United States v. Santos</u>, 403 F.3d at 1131.  Alone, Gutierrez' answers would not support reasonable suspicion, but the Court may consider them in the context of other factors.  Moreover, Bassett believed it was unusual for someone to stop in the courtyard area to pick someone up, because most people do not stop in that area to pick anyone up. <u>See</u> Tr. at 85:24-25 (Bassett); <u>id.</u> at 86:1-4 (Bassett).

Dunlap also justified his reasonable suspicion on Gutierrez' apparent extreme nervousness towards Dunlap.  <u>See</u> Tr. at 21:19 (Dunlap).  Dunlap saw Gutierrez' hands visibly shaking. <u>See</u> Tr.

at 21:20 (Dunlap).  Gutierrez' "nervousness is of limited significance in determining reasonable suspicion." United States v. Fernandez, 18 F.3d at 879.  See United States v. Walker, 933 F.2d 812, 817 n. 3 (10th Cir. 1992)("The general term "nervousness" encompasses an almost infinite variety of behaviors. No doubt there are circumstances in which an individual's nervous behavior would give rise to a reasonable suspicion of criminal activity.')  See, e.g., United States v. Peters, 10 F.3d at 1521;  United States v. Millian-Diaz, 975 F.2d at 722;  United States v. Hall, 978 F.2d 621 n.4; United States v. Walker, 933 F.2d at 817 n. 3.  Nevertheless, it is a factor that the Court can consider with others.

Gutierrez' presence at the bus depot, standing alone, is insufficient to support reasonable suspicion for his detention.  See Illinois v. Wardlow, 528 U.S. at 124.  On the other hand, a location's "disposition towards criminal activity is an articulable fact that may be considered along with more particularized factors to support reasonable suspicion." United States v. Gutierrez-Daniez, 131 F.3d at 942.  Therefore, the pattern of narcotics smuggling via the bus depots makes the location of Gutierrez' detention a factor in the reasonable suspicion calculus.  Likewise, Gutierrez' possession of a cellular telephone is not dispositive, but may be weighed in the calculus because it is a "recognized tool of the trade in drug dealing." United States v. Slater, 971 F.2d at 637.

The Supreme Court and the Tenth Circuit have cautioned courts not to engage in a "divide-and-conquer analysis" of reasonable suspicion.  United States v. Karam, 496 F.3d 1157, 1165 (10th Cir. 2007)(quoting United States v. Arvizu, 534 U.S. at 274). The Court "must consider the factors as a whole, giving due weight to the reasonable inferences of . . . [the officer's] expertise," United States v. Santos, 403 F.3d at 1133, because "[e]ven factors which are not alone probative of illegal conduct may combine to amount to reasonable suspicion." United States v. Karam, 496 F.3d at 1165.

-45-

In the totality, Dunlap testified his reasonable suspicion was based upon his conversation with Gutierrez, upon Gutierrez' baldness, and Gutierrez' nervousness.  See Tr. at 47:4-7 (Dunlap). Gutierrez' conversation with Dunlap regarding his reasons for being at the bus depot and Gutierrez' nervousness are of little weight in the totality of circumstances.  On the other hand, Bassett's observation that Gutierrez appeared to head towards the area where they had originally found Vega is of some weight, because his physical proximity to another independently suspected of a crime does not stand alone.  See United States v. Maddox, 388 F.3d at 1265 ("[m]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion. . . .").  Likewise, Dunlap's experience and knowledge of narcotics smuggling in shoes via couriers in bus depots, the recent arrest of Vega for narcotics found in his shoes, Vega's call to a person named "Pelon" who was supposed to pick him up at the bus depot, and Dunlap's belief that "Pelon" means bald or balding in Spanish, also weigh in the totality. In the aggregate, the totality of circumstances demonstrate Dunlap had reasonable suspicion to detain Gutierrez.

**III.**     **THE AGENTS HAD PROBABLE CAUSE TO ARREST GUTIERREZ.**

While the parties have debated when Gutierrez was arrested, the Court concludes that he was physically seized and arrested at the bus station, not later at ICE's headquarters.  Accordingly, the agents had to have probable cause at the time he was seized at the bus station.  The Court concludes that the agents had probable cause to arrest Gutierrez at the bus station.

**A.     GUTIERREZ WAS ARRESTED AT THE BUS DEPOT BECAUSE A REASONABLE PERSON WOULD NOT HAVE FELT FREE TO LEAVE.**

The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment.  They include:

[i]  The threatening presence of several officers; [ii] the brandishing of a weapon by an officer; [iii] some physical touching by an officer; [iv] the use of aggressive

-46-

language or tone of voice indicating that compliance with an officer's request is
compulsory; [v] prolonged retention of a person's personal effects; [vi] a request to
accompany the officer to the station; [vii] interaction in a nonpublic place or a small,
enclosed space; and [viii] absence of other members of the public.

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotations omitted). Under the totality

of the circumstances, Dunlap seized Gutierrez at the bus depot.

There were three officers at the bus depot interdiction: Dunlap, Dorian, and Bassett. See Tr.

at 10:10-12 (Ramirez & Dunlap). Dunlap and Bassett were not uniformed, and their guns and

badges were not visible. See Tr. at 8:21-25 (Ramirez & Dunlap); id. at 80:11-12 (Ramirez &

Bassett); United States v. Drayton, 536 U.S. at 205 ("The presence of a holstered firearm thus is

unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon

. . . ."). There is no evidence in the record regarding the tone of voice or language that Dunlap used,

although Dunlap asked Gutierrez for permission to speak with him. See Tr. at 20:10-18 (Ramirez

& Dunlap), id. at 20:24-21 (Dunlap). The interaction between Gutierrez and Dunlap took place in

an open public area -- outside of the bus depot. See Tr. at 85:24-25 (Bassett), id. at 86:18-20

(Bassett).

There is no indication in the record whether the officers' presence was "threatening," but

there was more than one officer present at the scene. Although Dunlap is the officer who placed

Gutierrez under arrest, see Tr. at 47:4-7 (Dunlap), all three officers made the decision to detain him,

see Tr. at 24:11-14 (Dunlap). Moreover, assertion of physical force on a person by an officer may

constitute a seizure. See United States v. Harris, 313 F.3d at 1235 ("Defendant was . . . seized for

purposes of the Fourth Amendment . . . [when the officer] implemented physical force by removing

Defendant's hands from his pockets and escorting him to the police car."). Dunlap physically

touched Gutierrez by handcuffing him. See Tr. at 63:14-17 (Ramirez & Dunlap).

Dunlap did not remember seeing many people in the general vicinity of the bus stop at the time that he approached Gutierrez.  See Tr. at 20:5-9 (Dunlap).  Dunlap asked Gutierrez for identification, and Gutierrez produced a New Mexico driver's license.  See Tr. at 21:20-21 (Dunlap), id. at 21:21-22 (Dunlap).  There is no indication in the record that Dunlap returned Gutierrez' license to him.  An officer retaining a person's identification documents is a relevant factor to seizure.  See United States v. Lopez, 443 F.3d at 1286 (holding that the defendant was seized because the officer retained the defendant's identification longer than necessary to confirm his identity, and "then took [the defendant's] license back to his patrol car, thereby rendering [the defendant] unable to leave.").

Under the totality of the circumstances, Dunlap placed Gutierrez under arrest at the bus depot.  A reasonable person would not have felt free to terminate the encounter because Dunlap retained Gutierrez' identification documents and placed Gutierrez in handcuffs.  Dunlap testified that he "arrested" Gutierrez at the bus depot "based only [on] [his] conversation with him, based on his nervousness, based on all those indicators that is why."  Tr. at 47:4-7 (Dunlap).  Dunlap's subjective opinion regarding when he arrested Gutierrez is irrelevant.  See United States v. Salinas-Calderon, 728 F.2d 1298, 1301 (10th Cir. 1984)(holding that officer's subjective belief of whether a defendant is under arrest is irrelevant -- "if [the] objective test is met, it is unnecessary that the officer hold a subjective belief that he has a basis for making the arrest.").  Although the United States contends that Gutierrez, Vega, and Fuentes-Ontiveros were arrested at the DEA office, after Dunlap had called Gutierrez' cellular telephone,  see Response at 13, a reasonable person, in handcuffs, with his identification documents retained by a police officer, would not feel free to terminate the encounter at the bus depot.  Gutierrez was arrested and seized within the meaning of the Fourth Amendment at the bus depot.

##### B.        THERE WAS PROBABLE CAUSE TO ARREST GUTIERREZ.

The United States contends that Dunlap had probable cause to arrest Gutierrez based on: (i) Dunlap's training, experience, and the collective knowledge of the agents at the station; and (ii) Gutierrez' actions "and his incoherent story about why he was at the bus station."  Response at 13. The United States contends that  "Dunlap had probable cause to believe the sealed bundles secreted in the shoes contained heroin or some other controlled substance and that defendant Gutierrez was the person to whom those shoes were to be delivered to, and that the $1,600 was for payment of the deliver[y]."  Id.  Dunlap testified that he "arrested" Gutierrez at the bus depot "based only [on] [his] conversation with him, based on his nervousness, based on all those indicators that is why."  Tr. at 47:4-7 (Dunlap).   See  United States v. Salinas-Calderon, 728 F.2d 1298, 1301 (10th Cir. 1984)(holding that officer's subjective belief whether a defendant is under arrest is irrelevant; "if [the] objective test is met, it is unnecessary that the officer hold a subjective belief that he has a basis for making the arrest.").

The showing that the United States must make for probable cause is higher than that for reasonable suspicion.   See  United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)("Reasonable suspicion is a less demanding standard than probable cause. . . ."); United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)("Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion.").  "[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."   United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004).  A court may not, however,  "arrive at probable cause by simply piling hunch upon hunch."  Id. at 897.

Dunlap was aware of previous narcotics' smuggling operations involving the use of shoes.

See Tr. at 7:9-14 (Dunlap).  Dunlap was aware that a substance suspected of being a controlled substance was found in Vega's shoes, and that Vega had said that he was there to drop the shoes to a person named "Pelon."  Id. at 18:18-25 (Dunlap).  Vega also said that he made a telephone call when he arrived at the bus station and was told to wait in front of the bus station by the person he called.  See id. at 18:19-22 (Dunlap).  Vega said he did not know exactly what the person looked like because he had never met him before that day.  See id. at 18:23-24 (Dunlap).

Probable cause may exist based upon a description given to an officer.  Vega did not give Dunlap a physical description of Gutierrez, but provided identifying information about "Pelon" to the officers.  Vega knew that the person coming for the drugs in his shoes was named "Pelon."  Tr. at 18:24-25 (Dunlap).  Vega did not give Dunlap a physical description of "Pelon."  Id. at 35:25-36:2 (Chavez & Dunlap).  Dunlap believed that "Pelon" means bald or balding in Spanish.  See id. at 36:4-6 (Dunlap).  Although Vega had not seen "Pelon" and therefore could not give a description to Dunlap, Vega had sufficient information to identify "Pelon" and conveyed that information to Dunlap.  See United States v. Klein, 93 F.3d at 701 (holding that the officers had probable cause to arrest the defendant based upon the fact that, when the officers arrived at the store, the officers observed the defendant, and matched him to the description given to them by an informant and by two other persons, and stating that it was irrelevant "[t]hat the officers did not know [the defendant's] actual identity until after they arrested him . . . .").  If Vega had enough description of "Pelon" to justify "Pelon" entrusting Vega with the drop, it goes against common sense to say that the police did not have enough description when they had as much information as Vega.

Dunlap also had collective knowledge based on information that Bassett and Dorian relayed to him.  See Karr v. Smith, 774 F.2d at 1031(noting that probable cause may be based on the collective information of the officers involved in the arrest, "rather than exclusively on the extent

of the knowledge of the particular officer who may actually make the arrest."). Bassett relayed information to Dunlap that he witnessed a small, red Volkswagen Jetta go through the area several times and then park across the street from where they had originally found Vega. See id. at 19:8-12 (Dunlap).  Dunlap observed Gutierrez, who appeared to be walking from the vehicle. See id. at 20:3-4 (Dunlap).  Gutierrez was bald. See id. at 20:4 (Dunlap). Dorian discovered approximately $1,600.00 in large bills in Fuentes-Ontiveros' pocket. See id. at 24:15-17 (Ramirez & Dunlap). Additionally, Dunlap had information regarding the suspected narcotics located in Vega's shoes. See Tr. at 16:13-17 (Dunlap), id. at 61:18-20 (Ramirez & Dunlap).  Dunlap also was aware of a pattern of narcotics transportation using shoes: "Usually the person who is wearing the shoes arrives and is picked up by someone else.  Usually they're transported somewhere else for a short period of time where they get a new pair of shoes or the illegal substance is taken out of their shoes.  Then generally they return to wherever they came from originally within a short period of time."  Tr. at 7:9-14 (Dunlap).

Dunlap's assertion of probable cause relies heavily upon his belief that Gutierrez' answers did not make sense.   As the Court has already noted, however, Gutierrez' answers to Dunlap's questions were not necessarily "incoherent," as the United States contends.  Indeed, Gutierrez' answers to Dunlap were not necessarily inconsistent, because Dunlap encountered Gutierrez before Gutierrez entered the bus depot, see Tr. at 45:24-46:4 (Dunlap & Chavez), and any "inconsistencies and gaps in [Gutierrez'] story were not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing," United States v. Santos, 403 F.3d at 1131.  Given Gutierrez' answers might not, alone, be enough to support probable cause, there were other indications of wrongdoing.

Given that Dunlap had not seen many people in the general vicinity of the bus stop at the

time that Gutierrez exited his vehicle, given what else Dunlap knew, about Vega, and given the agents' observations of Gutierrez' driving near the bus termination, Gutierrez' presence at the bus depot where Vega was arrested was not entirely consistent with an innocent explanation of looking for his wife.  See United States v. Najera, 165 Fed.Appx. at 704-705 (holding that probable cause existed to arrest a defendant based in part upon his presence at a remote farm, because "[t]he only reason for [the defendant's] presence was in connection with the drug transaction, and nothing points to an innocent explanation or even coincidence" given the farm's remote location and the fact that the farm was not open for business at the time the defendant was arrested).  It is true that, alone, Gutierrez' presence at the bus depot, unlike the defendant in United States v. Najera, could be consistent with picking his wife up from the bus depot.  See Tr. at 21:14-15 (Dunlap).  Dunlap encountered Gutierrez before Gutierrez entered the bus depot.  See Tr. at 45:24-46:4 (Dunlap & Chavez).  Dunlap asked Gutierrez, if she had arrived on the bus, where his wife was.  See id. at 21:15-16 (Dunlap).  Gutierrez told Dunlap he did not know.  See id. at 21:18 (Dunlap).  There were, however, other factors of which the officers were aware.  Like the co-defendants in United States v. Najera, Vega indicated to the officers that another person was involved in the narcotics' scheme and was coming to pick him up from the bus depot.  With the name and implicit physical description that Vega had provided, there was sufficient evidence in Gutierrez' presence at the bus depot to reasonably connect him to Vega.  See 165 Fed.Appx. at 702, 704.  Bassett testified that he saw Gutierrez looking towards the courtyard where Vega had been sitting when Gutierrez drove up to the bus depot.  See Tr. at 86:11-13 (Bassett). Bassett testified Gutierrez caught his attention because most people do not stop in the courtyard to pick anyone up.  See Tr. at 86:1-4 (Bassett).  Bassett told Dunlap that he saw Gutierrez, who was bald, driving back and forth out front, and told Dunlap it could be the person coming to pick up Vega.  See Tr. at 88:18-22 (Bassett).  Bassett testified that it

was unusual for persons to look at the courtyard area, or to even pick up persons in the courtyard area, and Gutierrez' actions in looking towards the courtyard area were consistent with him searching for Vega. Given the agents' training, and what they knew from Vega, Gutierrez' presence at the bus depot could be explained by a connection to Vega's drug transaction.

There was also some evidence connecting Fuentes-Ontiveros and Vega as companions. Dunlap knew that Fuentes-Ontiveros said Gutierrez had picked him up from work and asked him if he wanted to go on an errand with him to the bus station, to which Ontiveros said "Yes." Tr. at 24:4-6 (Dunlap). Dunlap had information from Fuentes-Ontiveros that he and Gutierrez were there to pick up an unknown male subject. See Tr. at 101:8-9 (Dorian). Although it is unclear from the record whether Dunlap knew about the currency discovered on Fuentes-Ontiveros before he arrested Gutierrez, at some point near the time when Dunlap arrested Gutierrez, Dorian discovered that Fuentes-Ontiveros had a large bundle of U.S. currency in one of his pockets that was folded in half. See Tr. at 102:21-24 (Ramirez & Dorian). Dorian had previously seen money carried in that fashion in narcotics' investigations. See Tr. at 102:25-103:5 (Ramirez & Dorian). If Fuentes-Ontiveros carried his money in a suspicious way, there would be additional evidence connecting Fuentes-Ontiveros and Vega.

Because the record is not clear when Dorian found the cash, the Court does not believe Dunlap or the Court can use this information to support probable cause. The Court can, however, rely upon the fact that Dunlap knew that Fuentes-Ontiveros and Gutierrez were to pick up an unknown male subject, not Gutierrez' wife. This information undercuts the credibility of Gutierrez' statements to Dunlap and the innocence of his remarks.

The quantum of evidence sufficient to satisfy probable cause is higher than that for reasonable suspicion.   See United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir.

-53-

2004)("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.")(quoting Alabama v. White, 496 U.S. 325, 330 (1990)).  "[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004).  The Court finds that a reasonable officer would have had probable cause to arrest Gutierrez based upon the information that Dunlap possessed.  While the Court could criticize and perhaps ignore each factor in isolation, the Tenth Circuit has warned the district courts not to disassemble the totality of the circumstances and look at the individual factors alone.  Moreover, while two or three of these factors might not, even together, be enough to support probable cause, the sheer number of factors in the case cannot be easily distinguished away.  At some point, a reasonable police officer must be left to bring his or her experiences and training to bear on the circumstances of a scene, and the number of factors in this case were sufficient for a reasonable officer to find probable cause.

The Court is mindful that the information possessed by Dunlap was less than, or at least different from,  the information that the officers possessed in Draper v. United States.  See 248 F.2d at 298-99 (holding that the officers possessed probable cause to arrest the defendant based upon information coming from a special employee of the Bureau of Narcotics where that employee had previously furnished information that was reliable and trustworthy; where the employee gave the defendant's address, a description of the defendant's race, complexion, age, weight, dress, walk, and bag he carried, the time of the defendant's departure from Denver, the defendant's destination, the

time of the defendant's return, and his model of travel; where the arresting agents verified that information by observing the defendant after he left the train; and where, after his detention by agents, two glassine paper bags with heroin and a hypodermic syringe were found on the defendant). The information in Draper v. United States was furnished by another officer, whereas the information linking Gutierrez to Vega -- a telephone number for a person named "Pelon" -- was provided by Vega, who had already been arrested for the suspected controlled substance in his shoes. See 248 F.2d at 298-99. Moreover, Dunlap did not verify the telephone number for "Pelon" as belonging to Gutierrez until they were at the DEA office. Thus, the Court cannot use the telephone number as an indicator of a connection between Vega and Gutierrez. Nevertheless, the Court believes that Gutierrez' conduct in context with Vega's arrest would lead a "reasonable officer to believe [Gutierrez] was committing or had committed a crime." United States v. Gordon, 173 F.3d at 767.

Dunlap had information available to him that was similar to the information that the arresting officers had in United States v. Bojorquez-Gastelum. See No. 96-1004, 1999 WL 466659 at *3. The probable cause in United States v. Bojorquez-Gastelum was largely based upon the defendant's and his companion's eye contact with officers, and the cocaine eventually discovered in the duffle bag of the defendant's companion. See id. Although there is no indication that Gutierrez had inappropriate eye contact with the officers, or was pointing them out to Fuentes-Ontiveros or Vega, there is evidence in the record connecting Gutierrez and Vega. Although Gutierrez was not apparently Vega's companion, unlike the defendant in United States v. Bojorquez-Gastelum, information from Vega and Fuentes-Ontiveros provided enough of a match to Gutierrez to create a connection between Gutierrez and Vega. See No. 96-1004, 1999 WL 466659 at *3. Again, if Vega had enough information to make a drug connection with Gutierrez, and if Fuentes-Ontiveros

and Gutierrez had enough information to meet up with Vega, it would seem that a reasonable police officer would also have enough information to put them together.  Bassett also testified it was unusual for persons to look at the courtyard area, although there was no indication that Gutierrez was staring at the officers in an unusual manner or attempting to hide from them unlike the defendant in United States v. Bojorquez-Gastelum.  See id.  Vega indicated that his shoes or the drugs in them belonged to "Pelon," like the luggage containing cocaine of the defendant's companion in United States v. Bojorquez-Gastelum.  See id.  In total, there was sufficient evidence linking Gutierrez and Vega at the time of Gutierrez' arrest that gave Dunlap probable cause to make that arrest.

Going beyond the factors that the United States contends were the basis for Dunlap's arrest of Gutierrez -- Dunlap's training, experience, and the collective knowledge of the agents at the station and Gutierrez' actions "and his incoherent story about why he was at the bus station," Response at 13 -- there is sufficient information to give Dunlap probable cause to arrest Gutierrez. Dunlap knew: (i) Vega had been intercepted at the bus depot with a suspected narcotic in his shoes; (ii) there was a pattern of smuggling narcotics in shoes using couriers who were picked up and then purchased new shoes; (iii) Vega had called a person named "Pelon," whom he had never met, who was supposed to come get the shoes; (iv) Gutierrez was seen by Bassett circling near the courtyard area and it was unusual for persons to be picked up in the courtyard area; (v) Gutierrez was bald on the day the incident occurred; (vi) Gutierrez told Dunlap that he was at the bus depot to pick up his wife, but was never permitted inside the bus depot to look for her; (vii) Gutierrez acted nervously when speaking with Dunlap; and (viii) Fuentes-Ontiveros said he thought he and Gutierrez were there to pick up a male at the bus station.  It may also be the case that Fuentes-Ontiveros was found with a large bundle of U.S. currency in his pocket folded in half, in a way in which Dorian had seen

money carried previously in narcotics' investigations.  Even without this last factor, the other factors,

in combination, are sufficient "facts and circumstances within . . . [Dunlap's] knowledge and of

which he had reasonably trustworthy information . . . to warrant a prudent [officer] in believing that

an offense has been or is being committed." Boydston v. Isom, 224 Fed.Appx. at 814.  While any

one of these factors alone might be insufficient to provide probable cause, taken in totality, the sheer

number of the factors demonstrate probable cause.  All of these factors combined, when viewed

from the perspective of a reasonable, trained police officer, are sufficient for probable cause.

"Probable cause is a matter of probability, not certainty. Probable cause requires only a probability

or substantial chance of criminal activity, not an actual showing of such activity.  Because a fair

probability is all the law demands, [the Court] do[es] not require greater proof -- certainly not

conclusive proof -- of any particular factor establishing probable cause."   United States v.

Stephenson, 452 F.3d 1173, 1178 (10th Cir. 2006). The Court believes that a reasonable police

officer would view all these factors to demonstrate a fair probability that Gutierrez was involved in

smuggling narcotics with Vega.[2]

---

[2] Gutierrez did not expressly  raise the issue whether the search of his cellular telephone at the DEA office was authorized under the Fourth Amendment.  Instead, Gutierrez argues that the officers lacked probable cause for his arrest.  See Motion to Suppress and Memorandum in Support at 1, 6-7.  In its Response, the United States relies upon the search of Gutierrez' cellular telephone to argue that the officers had probable cause to arrest Gutierrez.  See Response, at 12-13.
    The Court has decided that the officers had probable cause to arrest Gutierrez and denied the motion to suppress; if there are separate constitutional issues related to the search of the telephone at ICE's headquarters after the arrest, the Court does not address them, because Gutierrez has not raised them.  Similarly, the Court has not relied upon the search of Gutierrez' cellular telephone to find probable cause, because the Court has concluded that the arrest occurred before the telephone was searched; the officers needed probable cause before they left the bus station.  While the Court is not deciding the issues that the parties have not reached, the Court notes that  a federal district court within the Tenth Circuit has upheld warrantless searches of the memory of a defendant's cellular telephone that was seized incident to the arrest of the defendant as properly within the scope of an inventory search.  See United States v. Parada, 289 F.Supp.2d at 1303. The purpose of a search incident to arrest, however, is to search  "the area within [the defendant's] immediate control,

**IT IS ORDERED** that Defendant's Motion to Suppress and Memorandum in Support is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Larry Gomez
  Acting United States Attorney
Elaine Y. Ramirez
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Edward Chavez, Jr.
Albuquerque, New Mexico

     *Attorney for Defendant Alejandro Gutierrez*

Kenneth Gleria
Albuquerque, New Mexico

     *Attorney for Defendant Juan Vega*

---

meaning the area from within which he might gain possession of a weapon or destructible evidence." United States v. Rollins, 190 Fed.Appx. 739, 743 (10th Cir. 2006)(internal quotations omitted).  The federal district court in United States v. Parada has reasoned that an officer's search of the cellular telephone memory for the numbers of incoming phone calls was a separate question supportable by exigent circumstances because the agent in that case was concerned about subsequent incoming calls erasing earlier stored numbers.  See United States v. Parada, 289 F.Supp.2d at 1303-1304. The United States bears the burden of proving exigency. See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240 (10th Cir. 2003).  One federal district court has found that the United States did not carry its burden to demonstrate exigency by a preponderance of the evidence where "[o]fficers did not search the [cellular] phones out of a concern for officer safety, or to prevent the concealment or destruction of evidence . . . [where] the purpose was purely investigatory." United States v. Park, 2007 WL 15211573 at * 8.  Because Gutierrez relied upon a lack of probable cause for his suppression motion, the Court need not address the issue of whether the warrantless search of Gutierrez' cellular telephone was justified.  Gutierrez did not specifically request that the information obtained from his cellular telephone be suppressed or be suppressed for some reasons other than the lack of probable cause.

-58-